**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **CAROL BATES,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 5:08-CV-22 (CAR)** |
| | : | |
| **METROPOLITAN LIFE INSURANCE** | : | |
| **COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Currently before the Court are the parties' cross motions for summary judgment.  Through this action, Plaintiff seeks to recover benefits from a long-term disability policy provided as part of an employee welfare benefits plan sponsored by her employer, GEICO Corporation, and administered and funded by Defendant Metropolitan Life Insurance Company ("MetLife").  The case is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  Upon a thorough review of the claims file, the arguments of counsel, and the relevant legal authorities, the Court finds that the decision to deny Plaintiff's claim for benefits was neither wrong nor unreasonable. Defendant's motion for summary judgment [Doc. 14] is thus **GRANTED,** and Plaintiff's motion for summary judgment [Doc. 15] is hereby **DENIED**.

## STANDARD OF REVIEW IN ERISA CASES

As both parties have acknowledged, motions for summary judgment filed in cases governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq* are to be

1

reviewed in a slightly different manner from other summary judgment motions.  "Summary judgment is normally appropriate where no genuine issue of material fact exists, and such an issue exists only where a reasonable fact finder could find in favor of the nonmoving party."  Mack v. Metropolitan Life Ins. Co., 2007 WL 1720471, *2 (11th Cir. June 15, 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1277 (11th Cir. 2005)).  However, "[i]n an ERISA benefit denial case . . . , the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840 *7 (11th Cir. March 16, 2005) (unpublished per curiam opinion) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)).  Thus, "the role of the district court in ERISA matters is not to determine whether issues of fact exist for trial but to review the administrative record before it" under the ERISA framework and make "adjudications on both fact and law as would occur in a bench trial while handling the manner in an expedited fashion resembling summary judgment."  Wear v. Transamerica Life Ins. Co., 2007 WL 2274301 *3 (E.D. Tenn. August 07, 2007 ) (citing Wilkins v. Baptist Healthcare Systems, 150 F.3d 609, 617-20 (6th Cir.1998)).[1]

Although "ERISA provides no standard for reviewing decisions of plan administrators," Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir.2004), the Eleventh Circuit

---

[1] In the event that there is a dispute as to a material issue of fact, the parties have further consented to have the Court conduct this matter as a trial on the papers pursuant Fed. R. Civ. P. 52(a)(1) in lieu of Fed. R. Civ. P. 56 and accordingly resolve any fact questions.  This has been accepted as the preferable practice by other district courts.  See e.g., Crespo v. Unum Life Ins. Co. of Am., 294 F. Supp.2d 980, 991-92 (N.D. Ill. 2003) (finding that the more appropriate dispositive motion to be filed in an ERISA case is a motion for judgment based upon the administrative record with findings of fact and conclusions of law instead of a motion for summary judgment).

Court of Appeals has adopted a "well-defined series of steps in reviewing a denial of benefits decision in an ERISA case." Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1231-32 (11th Cir. 2006).  "At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry." Id. at 1232 (quoting HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir.2001)).  Previously, this rubric required that the district court:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is ' de novo wrong,' then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is 'de novo wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it . . . .
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Creel v. Wachovia Corp., 2009 WL 179584 *6 (11th Cir. Jan. 27, 2009) (slip copy) (quoting White v. Coca-Cola Co., 542 F.3d 848, 853-54 (11th Cir.2008)).  This well-known analysis was recently amended by the United States Supreme Court in Metropolitan Life Ins. Co. v. Glenn, ____U.S. ____, 128 S.Ct. 2343, (June 19, 2008), but it was altered only "to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard."

<u>Doyle v. Liberty Life Assur. Co. of Boston</u>, 542 F.3d 1352, 1360 (11th Cir.2008).   Accordingly, the sixth step in the ERISA standard of review is no longer required.   Conflict of interest is now simply a factor in considering whether an administrator's benefits decision was arbitrary and capricious, rather than the impetus for applying a heightened arbitrary and capricious standard.   <u>See</u> <u>White</u>, 542 F.3d at 854; <u>Doyle</u>, 542 F.3d at 1360.

Neither party in this case disputes the applicable analysis to be conducted by the Court. There is some dispute, however, as to what evidence may be considered by the Court.   In ERISA cases, it is often stated that review is confined to the evidence that was before the administrator when the claim for benefits was denied.   <u>Richards v. Hartford Life & Acc. Ins. Co.</u>, 153 Fed. Appx. 694, 697 n.1 (11th Cir.2005) (citing <u>Lee v. Blue Cross/Blue Shield of Ala.</u>, 10 F.3d 1547, 1550 (11th Cir.1994)).   <u>See</u> <u>also</u> <u>Anderson v. Unum Life Ins. Co. of Am.</u>, 414 F. Supp.2d 1079, 1101-1102 (M.D. Ala. 2006).   The Eleventh Circuit has also stated the rule otherwise, in cases in which an administrator is not vested with any discretionary authority, suggesting that "a district court conducting a de novo review of [a] . . . benefits determination is not limited to the facts available to the [a]dministrator at the time of the determination,' but instead can consider evidence regarding an individual's disability which was in existence at the time the plan administrator's decision was made, even though this evidence was not made available to the administrator."   <u>Anderson</u>, 414 F. Supp.2d at 1101 (reconciling the different uses of the term "de novo" review in ERISA cases and deciding whether a district court may consider evidence outside the administrative record) (quoting <u>Kirwan v. Marriott Corp.</u>, 10 F.3d 784, 789 n. 31 (11th Cir. 1994); <u>see</u> <u>also</u> <u>Shaw v. Connecticut General Life Ins. Co.</u>, 353 F.3d 1276, 1284 n. 6 (11th Cir. 2003).   Thus, it appears that the scope of evidence to be considered by the district court depends upon the extent of the authority granted to

the administrator. When the plan administrator is not vested with discretionary authority in reviewing claims, the district court may consider evidence outside the administrative record; otherwise the court is confined to the evidence that was before the administrator when the claim for benefits was denied. <u>Anderson</u>, 414 F. Supp.2d at 1102.

In this action, it is undisputed MetLife was vested with discretionary authority in reviewing claims. As such, this Court's review must be confined to the evidence that was before the administrator when the claim for benefits was denied. <u>Richards</u>, 153 Fed. Appx. at 697 n.1. Plaintiff has submitted evidence (including: updated medical records, residual functional capacity questionnaires completed by Plaintiff's treating physician and psychiatrist, and a fully favorable social security disability decision) created and compiled *after* MetLife's final decision in this case. Such evidence may not be considered by the Court.

Updated medical records are certainly not evidence that was in existence when the claim for benefits was denied in July of 2006. This alone is reason for not considering the evidence. <u>See Bendixen v. Standard Ins. Co.</u>, 185 F.3d 939, 944 (9th Cir. 1999) (holding that it was not error for district court to refuse to consider doctor's report given to the administrator after the final determination on the plaintiff's claim was made ) ("Because the report was not before the plan administrator at the time of the denial, the district court was limited to that record and could not consider the report in its review"). Moreover, such records likely evidence Plaintiff's condition at the time of the report and do not shed any new light on the status of Plaintiff's conditions during the period of elimination.

Likewise, the Court cannot properly consider a residual functional capacity questionnaire completed by Plaintiff's providers well after the administrator's final decision was made. The

questionnaires reflect Plaintiff's capacity when they were drafted, not during the relevant period. What is more, Plaintiff could have requested such a questionnaire and submitted it with her original claim, but she did not.  As such, it is not fair for the Court to consider the evidence now; it was not in existence at the time of the original decision and was not part of the record originally considered by the administrator.  See Anderson, 414 F. Supp.2d at1101-1102 (finding "inquiry is limited to a review of the evidence which was before the decision-maker at the time the decision was made").

Plaintiff's fully favorable Social Security award also cannot be considered by this Court, as it was rendered after MetLife's final decision in the matter.  Certainly, consideration of such an award may be helpful in some cases.  Yet, it is in no way binding and should not be considered when social security benefits were awarded well-after the administrator's decision was made or if it is based on information not available to the administrator.  Richards, 153 Fed. Appx. at 697 n.1 (finding district court correctly refused to consider plaintiff's award of social security benefits issued ten months after Hartford's final decision because ERISA review is confined to evidence before administrator when claim for benefits is denied). See also Menard v. Hartford Life & Acc. Ins. Co., 2008 WL 506228 (M.D. Fla.  Feb.14, 2008) (upon remand from Eleventh Circuit the district court limited its de novo review to administrative record and did not consider Social Security award rendered after disability insurer's final decision); Franklin v. Hartford Life Ins. Co., 2008 WL 5110836 * 13 n. 10 (M.D. Fla. Nov. 25, 2008) (finding that a post-decision Social Security award could not be considered by the district court); Harris v. Hartford Life & Acc. Ins. Co., 533 F. Supp.2d 1202 (M.D. Ala. 2008) (same).

With these standards in mind, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The present case arises from a denial of benefits under a long-term disability policy provided to Plaintiff Carol Bates as part of an employee welfare benefits plan ("the Plan") sponsored by her employer, GEICO Corporation, and administered and funded by Defendant Metropolitan Life Insurance Company.  Plaintiff, a fifty-two year-old female, was employed by GEICO for approximately twenty-five years prior to her filing a claim for benefits.  In her most recent position for GEICO, she worked as an Insurance Supervisor for the Audit Team.   According to her employer, this position required five to six hours a day of sitting and repetitive hand use and one to two hours a day of walking and standing.  Plaintiff was not required to bend over, twist, climb, reach above shoulder level, crouch, stoop, kneel, balance, push, pull or repetitively use her feet.  Plaintiff was only occasionally required to lift or carry up to 10 pounds and was never required to lift or carry more than 10 pounds.  This position also only required Plaintiff to engage in "interpersonal relationships" 34-66% of time and encounter "stressful situations" 1-33% of time.  (CL 000394).

In January of 2004, MetLife issued a group policy of insurance to GEICO to fund long-term disability benefits for its employees.  Plaintiff was a participant in the Plan.  Under the terms of the Plan (CL 000015) :

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2. after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking

into account your training, education, experience and Predisability Earnings.

With respect to interpretation of Plan provisions and determinations of eligibility, the Plan Document contains the following grant of discretion:

*Discretionary Authority of Plan Administrator and Other Plan Fiduciaries*

In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

Believing that she was disabled under the terms of the Plan, Plaintiff filed a claim for long term disability benefits in October of 2005.  There is no dispute in this case that, prior to that time, Plaintiff had suffered from multiple potentially debilitating conditions including: mitral valve prolapse (and a subsequent open-heart mitral valve repair), Wolfe-Parkinson-White Syndrome, pleurisy,  cervical and lumbar herniations and disc bulges, hypertension, and depression.  At times, Plaintiff suffered from these conditions simultaneously and in combination.

Plaintiff, nonetheless, coped with these medical conditions for years and was able to continue working without significant impairment until Spring of 2005.  At that time, Plaintiff complained to her physician about breathing problems and severe back pain.  A pre-existing back condition was possibly made worse in May of 2005 when she was involved in a car accident.  After the accident, Plaintiff claimed that she was not able to work.  That summer, Plaintiff continued to experience severe joint pain, and GEICO advised Plaintiff to stay off work for at least six months.

In October of 2005, after nearly five months of disability leave, Plaintiff determined that she could not return to her position at GEICO.  GEICO thus initiated a claim for long-term disability

8

benefits on Plaintiff's behalf on October 13, 2005, based on "Open Heart Surgery/Chronic Pain." (CL 000331).  Plaintiff's last day worked was May 24, 2005.  In conjunction with her LTD application, Plaintiff submitted a Long Term Disability Claim Form Employee Statement (with handwritten additions), dated October 22, 2005, and a Personal Profile dated November 11, 2005. Therein, Plaintiff detailed her medical history and various medications. (CL 000332-37).  Plaintiff further indicated that, as of that date, her back, neck, and shoulder pain had worsened and that she continued to suffer breathing pain.  She wrote:

> The overall feelings of no energy – tiredness – the severe pain when I breathe and shooting across my back up the left side of my neck is still there.  I have terrible depression and continue to take Cymbalta . . . daily. . . .  I can't remember to brush my teeth, use deodorant, or just minimal grooming.  I stay in the bed with a pile of candy, Pepsi, and the TV as my friend.  I am a pitiful wreck.  I can't interact with my kids or grand kids as I used to[.]  I can't even read . . . . Can't focus/concentrate.

(CL 000335).  Plaintiff complained that she had "pain in all joints" and "excruciating pain in back across ribs when breathing," that she had only "limited standing" ability, could not climb stairs, and had problems sitting due to her back and neck pain, and that she suffered from depression which limited her concentration.  (CL 000338).  When questioned as to when she expected to return to work, Plaintiff wrote "unknown" and that:

> "The consistent pain has changed me. I am now on multiple [prescriptions] and having so much pain for so long[.]  I am too short tempered and argumentative, very irritable, noticed short term memory loss as well as lack of quality concentration and focus."

(CL 000339).  Plaintiff described an inability to properly care for herself and a limited ability to do household chores or take part in social activities. (CL 000340).

In addition to these subjective claims of pain and impairment, Plaintiff further submitted "Attending Physician's Statements" (APS) from her primary care physician, Dr. Vaughn and her

psychiatrist Dr. Webster.  (CL 000325-31).  Dr. Vaughn indicated that Plaintiff only had the ability to sit/stand intermittently for 2 hours, walk intermittently for 1 hour, and occasionally lift up to 10 pounds and that Plaintiff could never climb, twist, bend, stoop, reach above her shoulders, or lift more than 10 pounds.  Dr. Vaughn also opined that Plaintiff could only work 1-2 hours per day due to her "stress related heart condition" and that it was "unknown" whether Plaintiff's medical condition would improve. (CL 000329-31).

The medical records submitted by Plaintiff showed that she initially presented to Dr. Vaughn with a chronic cough and complaints of pain.  Plaintiff's subjective complaints of pain in her chest, neck, back, and joints are, in fact, well-documented in the record.  Plaintiff was prescribed Lortab for pain, but also, at times, took Vicodin, Demerol, Vioxx, duragesic patches, and muscle relaxers (among other things) for pain associated with her various ailments.  Plaintiff was prescribed Zoloft and later Cymbalta for depression. (CL 000217-327).

According to her medical records, Plaintiff's coughing was initially thought to be caused by a heart condition.  ECG reports in March of 2003 were essentially "normal," but they did indicate that there was "severe mitral regurgitation." (CL 000308).  Plaintiff underwent a catherization in July of 2003 and had a mitral valve replacement shortly thereafter.[2]  (CL 000224).  Following the surgery, Plaintiff suffered from a number of postoperative problems, including pleurisy (an inflammation of the lung membrane which typically causes sharp pain when you take a breath)[3] (CL 000217), and several recurrences of pleural effusion.  Chest x-rays in fact showed small bilateral

---

[2] No surgical records were submitted to MetLife, but this point is undisputed.
[3] For its understanding, the Court takes notice that pleurisy occurs as a complication of a wide variety of underlying conditions. Relieving pleurisy involves treating the underlying condition, if it is known, and taking pain relievers.  See  http://www.mayoclinic.com/health/pleurisy/DS00244 (March 20, 2009).

effusions in the lung bases in November of 2003, but those appeared to clear shortly thereafter. (CL 000309-10).  The same occurred again the next month.  Bilateral small pleural effusions were discovered on December 2, 2003 and cleared days later. (CL 000311-12).  Plaintiff's pulmonologist, Alpha Watson, noted that Plaintiff appeared to suffer from "recurrent pleuritis and pleural effusions, etiology undetermined."  Her doctor thus opined that Plaintiff might "fall into the idiopathic recurrent pleural effusion category," meaning that the actual cause of the condition was unknown. (Id.).  Plaintiff was then placed on methotrexate and steroids to help with inflamation in her lungs. (CL 000239).

Plaintiff's complaints of severe joint and back pain were also examined in 2003.  An MRI showed that she had some developmental fuses and disk bulges. (CL 000315-16).  MRI of the thoracic spine was "normal," however, and MRIs of the cervical and lumbar spine did not image any other problems.  (CL 000314-16).  Lab results from December of 2003 also indicated that Plaintiff did not suffer from any rheumatologic illness such as rheumatoid arthritis or lupus. (CL 000311). Her bone density was checked in February of 2004, and she was found to be just inside the range for a diagnosis of being osteopenic (meaning that her bone density was lower than normal). (CL 000241).  Plaintiff, however, did not appear to suffer from any related fractures.

In 2004, Plaintiff also continued to experience breathing and coughing difficulties and complained of related pluerisy-type pain.  The methotrexate and steroids did not appear to be helping, but her pain was improved with the use of muscle relaxers. (CL 000243).  In June, Plaintiff visited Dr. Vaughn and requested to see another pulmonologist because Dr. Watson refused to re-fill her prescription for the narcotic duragesic patches.  (CL 000245).  The next day, however, a chest x-ray revealed no physical problems and showed that Plaintiff's lungs were clear and well-expanded.

11

(CL 000317).  Plaintiff returned a couple of weeks later and advised Dr. Vaughn that she had been unable to work in more than a week because of pain, coughing, and lack of sleep associated with the coughing. Plaintiff described a pleurisy-type pain around her chest and neck.  Dr. Vaughn noted that Plaintiff had abnormal lung sounds and was wheezing audibly during the office visit.  Her pulse oxymetry level, on the other hand, was 98% on room air.   Plaintiff was prescribed nebulizer treatments and steroids.  (CL 000247).

Plaintiff's heart was also examined shortly thereafter, on June 29, 2004. The report showed "normal LV function," "stable prosthetic mitral valve function," and noted only "mild mitral valve regurgitation." (CL 000318).

A few months later, however, Plaintiff was still complaining of severe pain around her chest and upper diaphragm, and her pain prescriptions were refilled (CL 000249).  In August of 2004, a chest x-ray showed some fluid in Plaintiff's lungs, which was likely the source of her chest pain. (CL 000319).  Follow-up x-rays showed "some fluid in the minor fissure on the right and probably infiltrate in the middle lobe" and "probably small bilateral pleural effusions along with mild cardiomegaly." (CL 000320-21).  No pneumothorax (a potential medical emergency wherein air or gas is present in the pleural cavity) was found, and other testing revealed that Plaintiff had no cardiac enlargement.  (CL 000319-21).

In October of 2004, Plaintiff began complaining of aching pain "all over" despite the fact that she was then taking Lortab once or twice a day and wearing the duragesic patches daily. Plaintiff also complained of shortness of breath and fatigue.  Plaintiff's lab results returned normal, however, and her pulse oxymetry was also normal.  (CL 000253-56).  This continued through the next month with Plaintiff complaining of chronic pain in her joints (with and without pain

medication), shortness of breath, fatigue, and depression.  Dr. Vaughn noted that much of Plaintiff's pain could be attributed to steroid withdrawal, as she had recently been weaned from a long-term steroid regime, and it was possible that the steroids were masking some of her joint pain. (CL 000260).

By January of 2005, Plaintiff requested to resume the steroid treatment, stating that she was "miserable all over" without the steroids.  (CL 000266).  Dr. Vaughn warned Plaintiff of the dangers of resuming the steroids (i.e., that it may decrease her bone density and increase her blood sugars), but Plaintiff still wanted the medication.  (Id.)  Plaintiff also complained of increased pain, inability to work, and inability to function on the pain medicines.  (CL 000269).  Because of her complaints, Plaintiff was referred to a specialist to determine whether she was suffering from Dressler's Syndrome (an inflamation that occurs in an injury to the heart or the outer lining of the heart).[4]  (Id.).  Dr. Vaughn also noted during this time that Plaintiff was having personal problems at work, claiming that people made her feel as though she was no longer "welcome" there.  (Id.)

Two months later, in March of 2005, Plaintiff's pulmonologist opined that while Plaintiff may have had Dressler's Syndrome in the past, she was now over it.  (Id.).  A lung specialist likewise advised Plaintiff that her heart was in good condition and that there was no evidence that Plaintiff suffered from a rheumatologic illness. (CL 000271).  Plaintiff's physicians again attempted to taper her off of steroids and pain medications.  (Id.).

---

[4] For background, the Court takes notice that Dressler's syndrome "is a complication that can occur following a heart attack or heart surgery. It occurs when the sac that surrounds your heart (pericardium) becomes inflamed."  http://www.mayoclinic.com/health/dresslers-syndrome/ds00666 (May 14, 2009).

In May of 2005, Plaintiff began complaining of severe back pain possibly caused by closing a window in a house she and her husband recently built.  Plaintiff believed that she may have aggravated an existing condition. (CL 000274).  At that time, Plaintiff was completely off steroid treatment but was still using Lortab, muscle relaxers, and duragesic patches for pain.  (Id.) Plaintiff also continued to complain of pain in her chest (particularly under her left breast) and problems breathing. (CL 000276).  However, tests at that time revealed that Plaintiff's lungs were clear and that no pneumonia or effusions or focal alveolar opacities were present.  Her chest x-ray was, in fact, "unremarkable" and indicated that Plaintiff was "without acute disease."  (CL 000322).

Shortly thereafter, Plaintiff was injured in a car accident while on her way to the hospital seeking treatment for her chest pain.  She complained of neck pain and headaches.  Plaintiff also reported increased depression after the accident, but Plaintiff denied having any homicidal or suicidal ideation.  (CL 000278).  Plaintiff then advised Dr. Vaughn that she was unable to return to work, and in July of 2005 requested that Dr. Vaughn complete the requisite disability forms.  (CL 000278-80).  At that time, Plaintiff also began seeing a neurologist, Dr. Smisson, for her back and neck pain, and a psychiatrist, Dr. Webster, for her depression. (CL 000281).  Dr. Smisson ordered an MRI of Plaintiff's neck and left shoulder and took over management of Plaintiff's pain medications.   Dr. Webster decreased Plaintiff's Zoloft and prescribed Cymbalta for her "depression." (Id.)  In September of 2005, while she was out on disability, Plaintiff complained of increased pain in her joints and pain with breathing.  At that point, she was continued on Lortab, the duragesic patches, and the muscle relaxers for pain, and was referred back to a rheumatologist.  (CL 000283-84).

The medical records submitted to MetLife prior to the denial of benefits do not evidence any further complaints, testing, or diagnosis of Plaintiff's pain and difficulty breathing. (CL 000285-91). The records from Dr. Vaughn only note that Plaintiff was being treated for a possible melanoma during October and November of 2005, when her application for benefits was filed.  (Id.). No medical records were submitted from Plaintiff's other treating physicians as to the status of her back condition. Nor were there any records indicating that she had in fact developed a rheumatological illness at that time or that the pleural effusions continued to re-occur.

Dr. Webster, Plaintiffs's psychiatrist, did, however, submit an APS to support Plaintiff's claim for benefits based on depression. (CL 000325-27).  Therein, Dr. Webster described Plaintiff's diagnosis as "major depression, single episode, severe" and noted that Plaintiff subjectively complained of low morale, decreased energy, sleep disruption, low appetite, and low concentration. (Id.) Dr. Webster categorized Plaintiff's psychological functions as a Class 4, which represents an inability "to engage in stress situations or interpersonal relations" and noted that Plaintiff's decreased concentration and energy may affect Plaintiff's ability to do her work.  (Id.)  Yet, Dr. Webster did not provide an opinion about whether Plaintiff could perform her work duties, how many hours she could possibly work a day, or whether any improvement in her condition was expected.

Upon review of the evidence submitted, MetLife denied Plaintiff's claim for long term disability benefits in December of 2005.  (CL 000173).  MetLife concluded that the medical evidence did not support a finding of functional limitations of a physical or psychiatric nature that would preclude Plaintiff's ability to perform the essential functions of her job throughout and beyond the elimination period from May 25, 2005, through November 21, 2005.

Without counsel, Plaintiff submitted a letter of appeal, and MetLife accordingly retained two independent physicians to review Plaintiff's file.  The first review was performed by Dr. Mark Schroeder, M.D., who is board certified in Psychiatry.  He opined that "the available information did not substantiate the presence of impairment . . . by means of specific, detailed and objective mental health information."  (CL 000154).  He supported this opinion by explaining that Dr. Vaughn's medical records only recorded "waxing and waning symptoms of depression." (CL 000152).  Dr. Schroeder likewise found Dr. Webster's APS to be unhelpful:

> The only record by a mental health specialist in the claim file is an [attending physician statement] by Psychiatrist Dr. Webster dated 11/11/05. This noted the diagnosis of major depressive disorder single episode severe. This diagnosis could potentially be impairing, but the record did not provide sufficiently detailed and specific information to substantiate the presence of impairment. The record noted general symptoms of depression and did not provide a more detailed description of these symptoms, for example, noting their intensity, frequency, and duration, which can be helpful in assessing potential impairment.  The record did not document more severe psychiatric symptoms, such a suicidal or homicidal thoughts with intent or plan, psychotic or manic symptoms, panic attacks with agoraphobia, morbid guilt, profound lethargy or severe disturbances with sleep or appetite, which may be more reliably associated with impairment.

> Objective psychiatric information is helpful in assessing how [Plaintiff's] self-reported symptoms may relate to ability to function.  The record did not provide such objective information, as by a detailed mental status examination or psychological testing. The record did not document more severe observed signs of psychiatric illness such as disorganized thought, impaired perception of reality, major cognitive deficits, slowed or agitated behavior, disturbed speech with communication or poor hygiene, which may more reliably reflect impairment.

> The record did not specifically state why [Plaintiff's] reported psychiatric symptoms would prevent her from working.  Providers did not identify the specific job duties that [Plaintiff] could not perform. . . .

(CL 000151-154).

A second independent review of Plaintiff's application for benefits was conducted by Dennis S. Gordan, M.D., board certified in Physical Medicine and Rehabilitation and Internal Medicine.

16

Like Dr. Schroeder, Dr. Gordan opined that the objective medical evidence in the record did not support a finding that Plaintiff was unable to work.  (CL 000157-66).   After reviewing and summarizing all of the medical records submitted to MetLife, Dr. Gordan wrote:

> By [May 25, 2005], it appears that the claimant's recurrent pleural effusions, which may have been "idiopathic," have resolved and have not recurred.  Her examinations have been normal.  There had been, prior to that time, of course, some serious complications, with need for chest tubes and thoracoscopy.  The file suffers from the fact that none of the detail is present.  She had a hint of a problem from closing a window on [May 11, 2005].  At that point, she had had MRIs of the lumbosacral spine, but the only ones of which we are aware do not image a severe problem.  She apparently had an MVA on [May 26, 2005], but there is no objective information about what happened.  At this point, she would appear to be physically dependent on her narcotics, but these are not affecting her much, since she is still driving.  They are not likely to be affecting her psychomotor performance.
>
> In summary, there is only subjective information about the claimant's complaints and some information about her medication.  If this claim is based on chest pain, there is no indication that this is a continuing problem.  If it is on the basis of an outcome from her motor vehicle accident, again, there is no objective information.

(CL 000160).

Based on the opinions of the consulting physicians, on July 18, 2006, MetLife affirmed its denial of Plaintiff's claim for long term disability benefits.  In so doing, MetLife advised Plaintiff that "the medical information does not support functional limitations of a psychiatric or physical nature that would preclude your ability to engage in your sedentary occupational duties" and informed plaintiff that "[t]his review constitutes MetLife's final determination on Appeal in accordance with the Plan and federal law."  (CL 000145-47).

Almost a year and a half after the denial of her appeal, Plaintiff, with the assistance of counsel, submitted yet another appeal of the final decision and additional evidence, including updated medical records, residual functional capacity questionnaires from Drs. Vaughn and Webster, and a fully favorable social security disability decision rendered after MetLife made its final

decision with respect to plaintiff's claim.  (CL 000040-119).  MetLife acknowledged receipt of

Plaintiff's submissions and included them in the claim file but refused to revisit the matter.  Plaintiff

was instead advised that she had previously "exhausted her full and fair appeal review in accordance

with the Geico Plan and ERISA guidelines." This lawsuit followed.

## DISCUSSION

Through this action, Plaintiff claims that MetLife's decision to deny her long-term disability

benefits was wrong, unreasonable, and arbitrary.  MetLife, on the other hand, contends that it is

instead entitled to judgment in this case because its decision was, in fact, the correct one.  So is the

case in most ERISA actions.

As discussed above, this Court must thus start its inquiry by determining whether MetLife's

benefits-denial decision, when reviewed de novo, was "wrong;" that is, this Court must "decide

whether it agrees with the administrator's decision."  Creel v. Wachovia Corp., 2009 WL 179584

*6 (11th Cir. Jan. 27, 2009); see also Williams, 373 F.3d at 1138 & n.8; HCA Health Servs., 240

F.3d at 993 n.23.  In determining whether MetLife's decision was "wrong," the Court does not give

any deference to MetLife's decision. Williams, 373 F.3d at 1137.  The court must instead "stand in

the shoes of the administrator and start from scratch, examining all the evidence before the

administrator as if the issue had not been decided previously." Stiltz v. Metropolitan Life Ins. Co.,

2006 WL 2534406 *6 (N.D. Ga. Aug. 30, 2006), aff'd 244 Fed. Appx. 260 (11th Cir. 2007).  At this

stage, the Court is essentially acting as a fact finder, reviewing the evidence and making a

determination on its own as to whether or not Plaintiff is entitled to disability benefits.  However,

the record on review must be restricted to "the facts as known to the administrator at the time the

decision was made." <u>Jett v. Blue Cross & Blue Shield of Ala.</u>, 890 F.2d 1137, 1139 (11th Cir.1989).

If this Court does not agree with MetLife's decision to deny the claim (and MetLife is vested with discretion in reviewing such claims), the Court must then determine whether "reasonable" grounds nevertheless supported the decision. <u>Creel</u>, WL 179584 at *6.   In other words, the Court must ensure that there was at least "a reasonable basis" for the decision and that the administrator's decision was not arbitrary or capricious. <u>See</u> <u>Glazer v. Reliance Standard Life Ins. Co.</u>, 524 F.3d 1241, 1246 (11th Cir. 2008).  Any conflict of interest on the part of the administrator must also be considered when determining whether the benefits decision was arbitrary and capricious. <u>See</u><u>White</u>, 542 F.3d at 854; <u>Doyle</u>, 542 F.3d at 1360.  Ultimately, if the Court either agrees with the decision of the administrator or otherwise determines that its decision was nonetheless was "reasonable" (i.e, not arbitrary or capricious), the decision must be affirmed. <u>See</u> <u>Glazer</u>, 524 F.3d at 1246.

In its final decision in this case, MetLife advised Plaintiff that, while the record indicated that Plaintiff did suffer from multiple chronic problems, there was still insufficient objective medical documentation to support a finding that she was totally unable to perform the essential functions of her job during the entire elimination period, i.e, May through November of 2005.  Upon review of the entire record, the Court agrees.   Clearly, Plaintiff does have a history of heart and respiratory problems and chronic pain.  She is medicated with narcotics and suffers from some depression. Plaintiff determined that she was no longer able to work in May of 2005, and submitted a claim for long-term disability benefits a few months later based upon "open heart surgery/chronic pain."  The record before MetLife at the time of its decision, however, fails to demonstrate that Plaintiff's

various medical conditions totally prevented her from performing the essential functions of her position during (or beyond) the relevant period.

A thorough review of the record in fact reveals that neither the objective nor subjective medical evidence before MetLife at the time of the decision necessitated a finding that Plaintiff's heart or respiratory conditions, chronic pain, depression, or any combination thereof completely prevented her from working during the period of elimination. MetLife afforded proper deference to the opinions of Plaintiff's treating physicians and was not required to obtain an independent medical examination or to conduct its own vocational review. Moreover, nothing in the record before MetLife suggests that Plaintiff's narcotic medications imposed such severe limitations on her functioning that she was totally unable to work. There was no indication that Plaintiff was unable to operate a motor vehicle and no clinical evidence indicating that the medications severely affected Plaintiff's psychomotor performance. Accordingly, the Court finds that MetLife's decision, given the record then before it, was not "wrong." Even if MetLife's decision was wrong, however, the Court further finds that MetLife's decision in this case was not unreasonable, arbitrary, or capricious. I. <u>The Evidence Did Not Require a Finding that Plaintiff's Heart and Respiratory Conditions, Chronic Pain, and Depression Totally Prevented her from Performing the Essential Functions of Her Own Occupation.</u>

In her claim for benefits, Plaintiff listed her disability as "open heart surgery/chronic pain." Plaintiff further explained that her recurrent pulmonary problems, pain, depression, and narcotic medications totally prevented her from performing the duties of her position at GEICO. Plaintiff did in fact undergo open-heart surgery in 2003 and apparently suffered from pleurisy and recurrent pleural effusions (fluid in her lungs) thereafter. Plaintiff also often complained of chronic pain in her back, neck, shoulder, and joints and reportedly suffered from some depression. The record

before MetLife at the time it decided to deny Plaintiff benefits, however, failed mandate a finding that these conditions (or any combination thereof) were so limiting that Plaintiff was unable to perform the essential functions of her own occupation.

For example, Plaintiff, in part, based her disability upon her prior "open heart surgery." The APS submitted by her treating physician, Dr. Vaughn, likewise indicates that Plaintiff is unable to work more than one or two hours per day "due to her stress related heart condition." However, the objective medical data submitted to MetLife suggests that Plaintiff's prior heart condition would not likely impose such a severe limitation. The relevant records show that Plaintiff was diagnosed with mitral valve prolapse in 2003. ECG reports in March of 2003 were essentially "normal," but indicated that there was "severe mitral regurgitation." (CL 000308). Plaintiff thus underwent a catherization in July of 2003 and had a mitral valve replacement the next day. Her heart condition apparently improved thereafter, and by June of 2004, only "mild mitral regurgitation" was noted. The same report also concluded that Plaintiff had "normal LV function" and "stable prosthetic mitral valve function." The latest notation about Plaintiff's heart condition was in March of 2005 when it was noted that Plaintiff had been advised that her heart was "in good condition," and Plaintiff's pulmonologist likewise opined that, while Plaintiff may have had Dressler's Syndrome in the past, she was now over it. No other records regarding any defect or limitations caused by Plaintiff's prior "open-heart surgery" were contained the in record. Thus, the medical data in the record simply does not support Dr. Vaughn's suggestion that Plaintiff's "heart condition" prevented her from working more than one or two hours per day.

Plaintiff's claim of total disability based upon her long-term respiratory issues was likewise unsupported by the record before MetLife. The medical records originally submitted to MetLife

indicate that Plaintiff did in fact suffer from pleurisy and recurrent pleural effusions, the cause of which is unknown.  The fact that Plaintiff did (and may still) suffer from pleurisy is undisputed.  The extent of the limitation cause by that condition, however, is undocumented.  Plaintiff's records indicate that she was diagnosed with pleurisy sometime at her initial consultation with Dr. Vaughn in 2003, if not earlier.  She thus worked and functioned adequately with this condition for years. Notes in Plaintiff's medical records further indicate that the pleurisy-related pain was improved with the use of muscle relaxers, and, by May of 2005, Plaintiff was no longer taking methotrexate or steroids to reduce inflamation in the lungs.

A significant amount of Plaintiff's chest pain and breathing problems were also attributed to her problems with recurrent pleural effusions.  Again, Plaintiff suffered with these issues long before her May 2005 resignation, without a significant limitation on her ability to function.  The effusions were first noted in 2003.  At that time, bilateral small effusions were observed but cleared days thereafter. The condition was again confirmed in 2004.  At that time, Plaintiff was complaining of severe pain around her chest and upper diaphragm.  A chest x-ray showed some fluid in Plaintiff's lungs, including "some fluid in the minor fissure on the right and probably infiltrate in the middle lobe" and "probably small bilateral pleural effusions along with mild cardiomegaly."

Thus, again, there is no dispute that Plaintiff previously suffered from this condition. Still, the severity of the condition and the actual limitations imposed thereby are not  clear.  In fact, as MetLife argues, there are some inconsistencies between Plaintiff's subjective complaints of respiratory pain and breathing problems and the objective medical data.  For example, in June of 2004, Plaintiff visited Dr. Vaughn complaining about her pain medications and requesting to see another pulmonologist.  The next day, however, a chest x-ray revealed no physical problems and

showed that Plaintiff's lungs were clear and well-expanded.  Plaintiff returned a couple of weeks later and advised Dr. Vaughn that she had been unable to work in more than a week because of pain, coughing, and lack of sleep associated with the coughing. Dr. Vaughn noted that Plaintiff had abnormal lung sounds and was wheezing audibly during the office visit.  Yet, despite Plaintiff's complaints and wheezing, her pulse oxymetry was 98% on room air and other tests returned normal.

Another inconsistency occurred just prior to Plaintiff's claim of disability, in May of 2005. Plaintiff then complained of pain in her chest and problems breathing.  Again, however, tests revealed that Plaintiff's lungs were clear and that no pneumonia or effusions or focal alveolar opacities were present. Her chest x-ray was, in fact, "unremarkable" and indicated that Plaintiff was "without acute disease."  The medical record at that time may also be read to show that Plaintiff's respiratory issues were actually improving rather than worsening.  As noted above, by that time, Plaintiff was able to function without the use of methotrexate or steroid medications, and her physicians wanted to likewise wean her from the pain medications. Significantly, there was no objective medical data after August of 2004 indicating that the pleural effusions were worsening or even re-occurring. As Metlife's consulting physician opined, by May of 2005, the "recurrent pleural effusions, which may have been 'idiopathic,' [appear to] have resolved and have not recurred."

One thing that was well-documented in the record, however, was Plaintiff's of chronic "pain," either in her chest, neck, shoulder, back, or joints.  In addition to her painful pleurisy, Plaintiff did suffer from a back condition and possibly suffered some aggravating injuries thereto in May of 2005, just before she felt that she was unable to continue working.  Plaintiff also complained of increased pain in her joints at that time.  Yet, again, the record before MetLife failed to support a finding that these back or joint injuries severely limited her ability to work.  The

medical records from Dr. Vaughn only record Plaintiff's subjective complaints of pain and note that Plaintiff began seeing another physician, Dr. Smisson, in 2005 for back and neck pain.  Dr. Smisson apparently ordered an MRI of Plaintiff's neck and left shoulder, but there was nothing in the record from Dr. Smisson evidencing the nature of Plaintiff's injuries or how (or if) they impaired her ability to work.   In September of 2005, just one month before her LTD claim was filed, Plaintiff complained of increased pain in her joints.  At that point, the record only indicates that she was continued on Lortab, the duragesic patches, and the muscle relaxers for pain, and was referred back to a rheumatologist.  It appears that no further evidence was presented to MetLife (before its final decision was made), which explained the nature of Plaintiff's condition or otherwise stated the exact limitations the condition caused her.

In contrast, all prior tests in the record then before MetLife showed that Plaintiff was free of any rheumatologic illness.  There was no objective medical data supporting a finding that she suffered from a joint or soft tissue disease.  Nor did the record reflect that Plaintiff had been diagnosed with Fibromyalgia (a syndrome that affects the muscles and soft tissue) at that time.  The only objective medical verification was of a back condition in 2003, two years prior to her application for benefits, when an MRI revealed that Plaintiff suffered from some developmental fuses and disk bulges.  MRI of the thoracic spine was "normal," and MRIs of the cervical and lumbar spine did not image any other problems. More recent MRIs were not submitted for review, and no diagnostic opinion of the MRIs that were available was submitted.  The only opinion before MetLife was that of its own consulting physician, who opined that the available MRIs "did not image a severe problem."

Finally, to the extent that Plaintiff attempts to rely upon her diagnosis of "depression" as a ground for long term disability, she similarly failed to provide sufficient objective evidence to MetLife to support a finding that her depression is so severe that it totally prevents her from performing her job. Plaintiff claimed to be depressed on multiple occasions, and that is clearly noted in her medical records. However, Dr. Vaughn's diagnosis of "depression" is apparently based solely upon these subjective statements. The medical records submitted contain no other rationale supporting the diagnosis and no discussion about the severity of any limitation caused by the depression. On the contrary, Dr. Vaughn noted that Plaintiff's depression seemed to improve with medication and that Plaintiff denied having any homicidal or suicidal ideation, which would have been indicative of a severe mental illness.

The APS provided by Dr. Webster, Plaintiff's psychiatrist, is also of little assistance in establishing that Plaintiff's depression impeded her ability to work. Dr. Webster merely listed Plaintiff's diagnosis as "major depression, single episode, severe" and noted that Plaintiff subjectively complained of low morale, decreased energy, sleep disruption, low appetite, and low concentration. Dr. Webster categorized Plaintiff's psychological functions as a Class 4, which represents an inability "to engage in stress situations or interpersonal relations" and noted that decreased concentration and energy may affect Plaintiff's ability to do her work. Dr. Webster did not, however, provide an opinion about whether Plaintiff could perform her work duties or how many hours she could possibly work a day.

As noted by MetLife's consulting psychiatrist, this record simply does not provide sufficient objective information to support a finding that Plaintiff's depression was so severe that she could no longer work. In other words, while Plaintiff possibly suffers from depression, the extent of the

25

limitations imposed by this condition is simply not clear.  The record did not: include a detailed description of intensity, frequency, and duration of Plaintiff's symptoms; suggest that she may suffer from more severe psychiatric symptoms; provide objective information such as detailed mental status examination or psychological testing; or document more severe observed signs of psychiatric illness such as disorganized thought, impaired perception of reality, major cognitive deficits, slowed or agitated behavior, disturbed speech with communication or poor hygiene, which may more reliably reflect impairment.  Most importantly, Dr. Webster did not specifically opine why Plaintiff's reported psychiatric symptoms would prevent her from working, other than note that Plaintiff complained that her ability concentrate was impaired.

Accordingly, in light of the foregoing, the Court agrees that the evidence before MetLife supporting Plaintiff's claim of disability was almost exclusively subjective – i.e., records of Plaintiff's own subjective complaints.  Certainly, Plaintiff's subjective reports, reports of pain in particular, should be considered and given some weight.  Oliver v. Coca Cola Co., 497 F.3d 1181, 1196 (11th Cir. 2007), vacated in part, on other grounds, 506 F.3d 1316 (2007). Still, plan administrators are "not required to automatically give significant weight to all subjective complaints."  Gietz-Richardson v. Hartford Life and Acc. Ins. Co., 536 F. Supp.2d 1280, 1292 (M.D.Fla. 2008).  They may also consider the extent to which objective medical evidence supports or contradicts subjective reports of pain. Id.  Thus, in most cases, the reasonableness of the decision to deny benefits must be evaluated "in light of the sufficiency of the claimant's subjective evidence and the administrator's actions."  Creel, WL 179584 at *7.  "Assuming that [a] claimant has put forward ample subjective evidence, [the court] must look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any

objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted." Id.

Obviously, in this case, Plaintiff provided ample subjective evidence of her impairments. Her medical records are peppered with subjective complaints of pain, shortness of breath, and depression. Plaintiff also clearly advised MetLife of her subjective medical and emotional condition and of what she believed her limitations were. The APS from Plaintiff's treating physicians support her claims. However, MetLife was able to identify specific objective evidence that would have proved Plaintiff's subjective claims, i.e., MRIs, chest x-rays, lab results, etc., but were lacking in the record. MetLife further obtained qualified, relevant, consulting physician opinions, which confirmed the conclusion that the objective medical evidence did not indicate that Plaintiff suffered any severe limitations. In other words, there was simply insufficient objective medical evidence supporting Plaintiff's claims before MetLife at the time the decision to deny benefits was made. MetLife afforded proper consideration to Plaintiff's subjective complaints and made sufficient efforts to evaluate the veracity of her claim.

MetLife in fact urged Plaintiff, in October of 2005, to ensure that her physicians submitted all necessary "office notes, test results, etc. from May 2005 to the present." (CL 000212). Still, recent MRIs on Plaintiff's neck and shoulder were not submitted, and Plaintiff failed to provide MetLife with any medical records from the specialists who had diagnosed her with relevant medical condition in those areas or to otherwise provide objective medical evidence supporting her claims of severe physical and mental limitations. Without such information MetLife denied the claim for benefits.

Plaintiff appealed this decision,[5] and MetLife retained two independent physician to evaluate her file. MetLife sought the professional assistance of Dr. Mark Schroeder, a board certified psychiatrist, and Dennis S. Gordan, M.D., a physician certified in Physical Medicine and Rehabilitation and Internal Medicine.  Upon review of Plaintiff's file, Dr. Schroeder concluded that the available information about her "depression" did not substantiate the presence of impairment . . . by means of specific, detailed and objective mental health information."   In other words, the medical evidence simply did not support a diagnosis of "major depression" or otherwise support a finding that Plaintiff's depression was so severe that it totally impeded her ability to work.   Dr. Gordan conducted a thorough review of the available medical records and provided complete summary thereof.  (CL 000160-65).  Thereafter, he similarly concluded that the objective medical evidence in the record did not support a finding that Plaintiff was physically unable to work.

MetLife was not wrong to rely on these physicians' opinions and afford less weight to the unsupported conclusions of Plaintiff's treating physicians.   The law is in fact clear that an administrator is not required to give greater deference to the opinions of a claimant's treating physicians than to their own hired consultants.  Brannon v. BellSouth Telecommunications, Inc., 2009 WL 567234 *4 (11th Cir. 2009) (unpublished) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823-24, 123 S.Ct. 1965, 1972, 155 L.Ed.2d 1034 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation

---

[5] Plaintiff then advised MetLife that she had been diagnosed with Osteo-Arthris and Fibromyalgia and that she was experiencing ocular migraines, which affected her vision and prevented her from driving.  Plaintiff also stated that, after her May 2005 car accident, she had been diagnosed with degenerative disk disease and bone spurs.  It is unclear, however, what, if any,  additional medical records or objective evidence was then submitted to support these claims. It appears that additional medical records were not submitted until Plaintiff initiated a second appeal in November of 2007, nearly a year and a half after the final decision to deny benefits was made.

when they credit reliable evidence that conflicts with a treating physician's evaluation.")); see also Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1536 (M.D. Fla. 1996) ("[T]he district court is not required to give greater weight to the opinion of a treating physician . . . "). An insurer is entitled to weigh the conclusions of an insured's personal physicians against the conclusions of other professionals, with due regard for the relative qualifications of the various providers and for the objective bases of their opinions. Similarly, to the extent that a treating physician relies upon a patient's subjective complaints of pain, the administrator need not give special deference to the complaints "simply because the symptoms were first passed through the intermediate step of self-reporting to a medical [professional]." Giertz-Richardson, 536 F. Supp. 2d at 1292 (quoting Hufford v. Harris Corp., 322 F. Supp.2d 1345, 1356 (M.D. Fla. 2004)).

This is true even when the opinions of the administrator's consulting physicians are based solely upon a paper review. As recognized by the United States Court of Appeals for the Seventh Circuit,

> "In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations . . . ."

Davis v. Unum Life Ins. Co. of Am., 444 F.3d 569, 577 (7th Cir. 2006).

Of course, a plan administrator may not ever "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker, 538 U.S. 822 at 823. However, that is not what happened here. MetLife did not refuse to credit the opinions of Plaintiff's treating physicians, it merely determined that those decisions were not supported in the record by sufficient objective medical evidence. Inasmuch, MetLife concluded that the record was lacking

29

in objective medical foundation and that the providers' opinions were in fact inconsistent with the objective evidence that was in the record – a finding which was supported by their own consulting physicians.

Contrary to Plaintiff's assertions, MetLife was not obligated to contact Plaintiff's treating physicians for more information. Jett, 890 F.2d at 1140 ("It cannot be said that the decision not to contact [the plaintiff's treating physician] constituted abuse of discretion.").  Nor was MetLife required to obtain its own independent medical examination, functional capacity examination, or vocational review to rebut the opinion of Plaintiff's treating physicians.  See Hufford v. Harris Corp., 322 F. Supp.2d 1345, 1359 (M.D. Fla. 2004).  The United States Court of Appeals for the Fifth Circuit has even gone so far as to hold that a district court may not impose a duty on the administrator to reasonably investigate all claims of disability.  Vega v. National Life Ins. Serv., Inc., 188 F.3d 287, 298 (5th Cir. 1999).  Inasmuch, "[t]here is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may have been more readily available to he claimant." Id. Rather, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." Hufford, 322 F. Supp.2d at 1359 (citing Donato v. Metro., Life Ins. Co., 19 F.3d 375, 380 (7th Cir.1994)).  Furthermore, where additional medical evidence is available about the claimant's medical condition but not submitted to the administrator, as is the case here, "it is not only inappropriate but inefficient to require the administrator to obtain that information . . . ." Vega, 188 F.3d at 298.

30

As to MetLife's failure to obtain a vocational review in this case, it should be noted that Dr. Vaughn's APS itself did not support a finding that Plaintiff was completely unable to perform the duties of her position, which were clearly laid out for MetLife by Plaintiff's employer. Inasmuch, a vocational review may not have been warranted if there was no reliable evidence that Plaintiff could not perform the essential functions of her own position. In the APS, Dr. Vaughn opined that Plaintiff only had the ability to sit/stand intermittently for 2 hours, walk intermittently for 1 hour, and occasionally lift up to 10 lbs but that Plaintiff could never climb, twist, bend, stoop, reach above her shoulders or lift more than 10 lbs. According to her employer, however, Plaintiff's prior position only required 5 hours a day of sitting, and 1 or 2 hours a day of walking and standing. Plaintiff was not required to bend over, twist, climb, reach above shoulder level, crouch, stoop, kneel, balance, push, pull or repetitively use her feet, and Plaintiff was only occasionally required to lift or carry up to 10 pounds, and was never required to lift or carry more than 10 pounds. Thus, on this point alone, Plaintiff failed to show that she was *totally* unable to work. A comparison of Dr. Vaughn's assessment and Plaintiff's job description in fact suggests that Plaintiff may have physically been able to work for some periods. The required period of sitting seemed to be the only limiting requirement (i.e., she was only capable of sitting two hours of sitting rather than five). Moreover, Dr. Vaughn's opinion that Plaintiff could only work 1-2 hours per day due to her stress related heart condition is completely unsupported by the record and need not have been considered dispositive by MetLife. As noted above, there is nothing in Plaintiff's medical records to suggest that Plaintiff's present "heart condition" would completely prevent her from working.

Finally, the Court finds that MetLife did not incorrectly or unreasonably discount the effect of Plaintiff's pain or narcotic medications on her ability to perform the essential functions of her

position.  It is undisputed that Plaintiff is medicated with multiple narcotics, including Lortab, duragesic patches, and muscle relaxers (and possibly others) for pain.  And, there is no doubt, as Plaintiff contends, that pain and pain medications can impact one's cognition, concentration, and focus.  The question in this case, however, is not whether Plaintiff's pain and medications affected her but to what extent she was affected.  Here, as noted above, there was little or no objective information in the record indicating that Plaintiff's pain medications prevented her from working at all.  In fact, Plaintiff was taking narcotics for pain for years prior to her resignation in May of 2005 and was apparently still able to work and function normally.  What is more, MetLife's consultants did specifically consider the effect of Plaintiff's medications and found that while there was some evidence that Plaintiff was "physically dependent on her narcotics," Plaintiff was still able to operate a motor vehicle and the medications did not appear to severely affect Plaintiff's psychomotor performance. (CL 000 159-60).  Plaintiff has thus failed to point to any evidence before MetLife at the time of their decision, other than subjective, general statements of pain, depression, and lethargy, which would indicate that her pain and medication rendered her completely unable to work.

That is not to say that Plaintiff's statements should be completely discounted in this case.  As Plaintiff argues, she should be afforded a fair amount of credibility.  She had a consistent work history with GEICO and worked for twenty-plus years before she filed a claim for disability.  Inasmuch, neither this Court nor MetLife need to completely reject Plaintiff's subjective contentions that she is, in fact, affected to some extent by her pain and medication.  Still, what ultimately remains to be proven in this case is that Plaintiff's various medical conditions, pain, and medication

impose such severe limitations that Plaintiff could not perform the essential functions of her own position.

Plaintiff put forth ample subjective evidence of her chronic pain and depression, and in response, MetLife made appropriate efforts to evaluate the veracity of her claim, identifying objective evidence that would have proved her claim and obtaining relevant and appropriate independent physician evaluations. Plaintiff's claim lacked inclusion of relevant MRIs and lab results to establish new physical conditions or exacerbated pre-existing conditions which imposed severe limitations on her ability to work. Her claim likewise failed to include the objective medical data necessary to evaluate the extent of any mental impairment she might suffer. The evidence favoring a denial of benefits thus outweighed the evidence that Plaintiff was incapable of performing her own occupation, notwithstanding the opinions of her treating physicians.  Compare with, Hensley v. International Bus. Machines Corp., 2004 WL 2857576 *3 (4th Cir. Dec. 13, 2004) (noting that the record was "largely devoid of *objective* medical evidence of total disability, such as x-rays, test results or MRI reports," and according less credibility to diagnosis letters of plaintiff's treating physicians where they submitted no objective evidence in support of their conclusions) (emphasis in original). MetLife accordingly concluded that Plaintiff's subjective claims of pain and depression did not mandate a finding of total disability. On de novo review, after a full examination of all the evidence before MetLife, the Court reaches the same conclusion.

II.   Reasonable Grounds Supported the Decision to Deny Benefits, Even if the Ultimate Decision was Wrong.

Because the evidence favors MetLife's decision in this case, the denial of benefits would be affirmed even without a deferential standard of review. The result on de novo review is a close call,

33

however, and the evidence in Plaintiff's favor is not negligible.  Accordingly, some attention to the arbitrary and capricious standard of review is warranted.  Yet, even if the scales tipped in the other direction in this case and MetLife's decision was found to be de novo wrong, the decision must still be considered a reasonable decision under the circumstances. There are no factors in evidence to indicate that the decision was arbitrary and capricious or that MetLife's conflict of interest improperly influenced its exercise of discretion. The evidence in the record shows that the decision was reasonable and supported by substantial objective evidence.

Here, MetLife reasonably required some objective medical evidence to support Plaintiff's claim of total disability – especially in light of the fact that the objective medical evidence in the record actually indicated that Plaintiff was without significant limitation.  Again, just prior to period of disability, the test results showed that Plaintiff then was free of any significant heart or lung defect and free of any rheumatological illness.  This objective evidence was clearly inconsistent with both Plaintiff's subjective claims and the opinions of her treating physicians.  As such, it was not unreasonable for MetLife to question the opinions of Plaintiff's treating physicians, which they believed to be unsupported by the record before it, and instead defer to its own independent consultants in the matter. See e.g., Kimber v. Thiokol Corp., 196 F.3d 1092, 1099 (10th Cir. 1999) (finding that it was not arbitrary or capricious to question objective reliability of treating physician's opinion, where the physician "merely state[d] that [the claimant was] 'totally disabled' . . . but [did] not include any reference to clinical data").

The closest call in this case was  the question of whether Plaintiff's well-documented, chronic pain in fact limited her ability to work.  Plaintiff's subjective complaints were very detailed about the extent of the limitations her pain caused her.  In her LTD claim, Plaintiff advised MetLife

34

that she had "pain in all joints" and "excruciating pain in back across ribs when breathing," and that she had only "limited standing" ability, could not climb stairs and had problems sitting due to her back and neck pain.  Plaintiff additionally complained of  "short term memory loss as well as lack of quality concentration and focus."  The medical records submitted in fact demonstrated that Plaintiff undoubtedly suffered from painful pleurisy and some back injury.

Yet, even if this Court had disagreed with MetLife's conclusions as to whether Plaintiff's chronic pain impaired her ability to perform the essential functions of her own occupation, MetLife's decision to deny benefits was still not unreasonable, arbitrary, or capricious.  As discussed above, the large part of Plaintiff's pain complaints began long before her term of disability began.  She was nonetheless able to continue to function prior to May of 2005 without significant impairment, and nothing in the record indicates a clinical explanation as to a sudden increase in Plaintiff's pain other than a possible exacerbation of her pre-existing back or neck injuries in a May 2005 car accident.  Still, no objective medical evidence about those injuries or what limitations they imposed was included in the material submitted to MetLife prior to the final decision to deny Plaintiff's claim.   Under such circumstances, it is not unreasonable for an administrator to require some documentation of specific restrictions and/or limitations that preclude a plaintiff from working.  "Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." Coffman v. Metro Life Ins. Co., 217 F. Supp. 2d 715, 732 (S.D. W. Va. 2002), aff'd, 2003 WL 22293610 (4th Cir. Oct. 7, 2003).

In the end, it was Plaintiff who bore the burden of proving "by a preponderance of the evidence that [she] is entitled to . . . disability benefits within the terms of the policy." Papczynski

35

v. Connecticut General Life Ins. Co., 730 F. Supp. 410, 413 (M.D. Fla. 1990).  Upon a de novo review, however, the Court cannot find that Plaintiff has met her burden in this case.   Plaintiff places a great deal of emphasis on whether she was actually diagnosed various conditions, and, as stated many times herein, this Court has no doubt that Plaintiff suffered from such conditions and in fact now endures some pain.  The operative inquiry, however, is whether Plaintiff was "disabled" within the meaning of the Plan's language as of the date of her resignation; i.e., whether her various medical conditions totally prevented her from working during the relevant time period.  The record before MetLife at the time of its decision just simply did not illustrate that Plaintiff's limitations were so severe that she could not work.  MetLife's decision to deny benefits, therefore, was not "wrong."  Even if MetLife's decision was "wrong," it was certainly not unreasonable or arbitrary given the slight objective evidence in the record and the opinions provided by their own independent consulting physicians.

**CONCLUSION**

Whereas MetLife's decision to deny benefits was correct and consistent with the weight of evidence in the record, and whereas it was not arbitrary and capricious, the decision must be affirmed.   Accordingly, the Clerk of Court is hereby directed to enter judgment in favor of Defendant and against Plaintiff.

**SO ORDERED**, this 27th day of July, 2009.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT COURT

JLR/ak